**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Xochitl Padilla-Barron,<br><br>Defendant. | No. CR-09-01355-002-PHX-DJH<br><br>**ORDER** |

Pending before the Court is the Defendant's Motion for Compassionate Release. (Doc. 208). The Government has filed a Response (Doc. 213), to which the Defendant has filed a Reply. (Doc. 214). The Government has also filed a Notice of Supplemental Authority. (Doc. 215). For the reasons stated below, the Court denies the Defendant's Motion.

**I.     Factual Background**

The Defendant pled guilty to Conspiracy to Commit Hostage Taking in violation of Title 18 U.S.C. § 1203(a) on April 14, 2010. (*Sealed* Doc. 170). The Defendant's plea agreement outlines the conspiracy as one involving holding illegal aliens, who had been smuggled into the United States, for monetary ransom. (*Id*. at 8). The conspiracy took place from July 6, 2008 through October 21, 2009. (*Id*.) The Defendant's role was to "help oversee the money collection and accounting relating to 'drop houses' operating in Phoenix – that is, houses where smuggled aliens would be held hostage until their friends and family members paid the ransom fee – and also to rent and supply vehicles used to transport

smuggled aliens to and from the drop houses." (*Id*.) The Defendant also admits knowing that others involved in the conspiracy acted as armed guards who threatened people until their ransom fees were satisfied. (*Id*.) The Defendant's husband and co-conspirator, Jose Barron-Herrerra, transported and called hostages' families to essentially threaten that their family member would continue to be detained unless payment was made. (*Id*.) Toward the end of the conspiracy, the Defendant was running a drop house, helped to locate rental homes and vehicles for use in the operation of the conspiracy, and she equipped a drop house guard with a cell phone and rifle. (*Id*.)

The Defendant was initially released on her own recognizance pending trial. (Doc. 5). However, approximately one-month after pleading guilty, she absconded to Mexico and a warrant for her arrest was issued. (*Sealed* Docs. 86 & 87). Consequently, the Defendant's sentencing hearing was delayed until her eventual arrest on December 21, 2010. (Doc. 113). The Defendant was eventually sentenced on October 3, 2011 to 198[1] months in the Bureau of Prisons custody followed by five years on supervised release. (Doc. 171). At the time of her sentencing hearing, the Defendant was twenty-nine years old. She began serving her custody term on December 2, 2010 and she is detained in the Federal Correctional Facility in Phoenix, Arizona ("FCI"). (Doc. 213 at 3). She has served approximately 10.5 years of a 16.5 year sentence. Her projected release date is February 25, 2025. (*Id*.) Upon her release, she will begin her five-year supervised release term.

The Defendant brings her Motion "in light of the extraordinary and compelling circumstances presented by the current pandemic, [her] medical conditions, and also due to her elderly mother's particular susceptibility to COVID-19 due to her serious medical conditions." (Doc. 208 at 1).

**II.     Legal Standards**

a. Exhaustion of Administrative Remedies

---

[1] The plea agreement stated that the Defendant would not receive a greater than 180 month sentence. It is not readily apparent in the court's docket whether the sentencing court rejected the sentencing agreement. It is apparent, however that her absconding to Mexico and additional sentencing enhancements resulted in a greater than anticipated final adjusted sentencing guideline range.

Generally, a district court "may not modify a term of imprisonment once it has been imposed" unless the Congressionally mandated exception is present. 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824-25 (2010). That exception is present when either the motion to modify sentence is brought by the Bureau of Prisons ("BOP") "or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal[.]" 18 U.S.C. § 3582(c)(1)(A) (emphasis added). The statutory language is unambiguous and not waivable. *See United States v. Weidenhamer*, 2020 WL 1929200 *2 (D. Ariz. Apr. 21, 2020) ("If the statutory language contains mandatory language . . . a court may not excuse a failure to exhaust") (citing *Ross v. Blake,* 136 S. Ct. 1850, 1858 n.2 (2016)). Thus, the Court may not consider a defendant's motion without proof that he meets this exhaustion requirement.

Although neither party includes or discusses the FCI Warden's decision, they both agree that the Defendant sought compassionate release from the Warden, and that thirty days has expired since her request was made. (Doc. 208 at 11) (Doc. 213 at 6). The Court will consider these avowals as sufficient proof that the Defendant as exhausted her administrative remedies.

### b. Extraordinary and Compelling Reasons

Once a defendant has exhausted her administrative remedies, she may bring a motion to the district court that extraordinary and compelling reasons nonetheless warrant her release. To determine what an extraordinary and compelling reason is, the First Step Act refers to 1B1.13 n.1 of the sentencing commission's policy statement. But, as the Ninth Circuit recently observed, since the First Step Act became law, the U.S. Sentencing Commission has not updated the 1B1.13 policy statement. Thus, the Court may, as it has previously done, consider the aforementioned policy statement, among other factors. Section 1B1.13 suggests considerations of 1) a defendant's serious advanced illness or medical condition; 2) whether the defendant is at least 65 and experiencing physical or mental health problems due to his/her advanced age, and the length of time incarcerated; 3) specific family circumstances; and 4) other reasons as determined appropriate by the

Director of the BOP. *See* U.S.S.G. § 1B1.13 cmt. 1(A)-(B). The sentencing commission has not altered its guidance since the First Step Act was amended, thus, courts may independently determine whether such other reasons are present on a case-by-case basis and without deference to the BOP. *See United States v. Carter* 2020 WL 3458598, at *4 n.3, n.4 (D. Ariz. June 25, 2020) (citations omitted).

The Defendant also asks the Court to consider the circumstances of her 67 year-old mother who cares for her three children ages 18, 15 and 13. The aforementioned Sentencing Commission's application note states that a sentence reduction may be brought due to "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children." 1B1.13 cmt.n.1(C). As several district courts have observed, there is a dearth of law on what warrants a reduction in sentence due to "family circumstances." *See United States v. McKinney*, 2020 WL 6076898 at *4-5 (W.D. Wash. Oct. 15, 2020); *United States v. Boden*, 2020 WL 4286820, at *4 (W.D. Wash. July 27, 2020). These, and other courts note that the BOP Policy Statement 5050.50, is instructive. However, as mentioned above, the Court is not bound by its application.

The Court must also "consider [ ] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c). Those factors include "the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims." *United States v. Trujillo*, 713 F.3d 1003, 1008 (9th Cir. 2013). A court should not grant a sentence reduction unless it determines that the defendant is not a danger to the safety of any other person or to the community. *See* U.S.S.G. § 1B1.13(2); s*ee also United States v. Baye*, 2020 WL 2857500 *10 (D. Nev. June 2, 2020) (citing cases). Therefore, the Court must find both extraordinary and compelling reasons for compassionate release *and* that the 3553(a) factors support such release. *See United States v. Ruelas*, 2020 WL 5645093, *2

(D. Ariz. Sept. 22, 2020) (citations omitted). The Defendant bears the burden of establishing that extraordinary and compelling reasons exist that justify her release, *Riley v. United States*, 2020 WL. 1819838, at *7 (W.D. Wash. Apr. 10, 2020).

### III. Analysis

a. Medical conditions

The Defendant first asserts that she warrants compassionate release because she "suffers from stress and anxiety that would arguably put [her] at a higher risk of contracting COVID-19 and her outcome while incarcerated may be less certain than it would be in the community." (Doc. 208 at 8). The defendant's other health concerns are anemia and thrombocytosis, and it was recommended that she be tested to rule out certain types of cancers. The Government argues that none of the Defendant's conditions are among those recognized by the Centers for Disease Control ("CDC") as placing "or even potentially placing [her] at a risk of severe illness from COVID-19." (Doc. 213 at 9). The Government further asserts that her basis for seeking release is premised upon generally speculative occurrences that may impact her health. The Court agrees.

The Court concurs with the Government's observation that anxiety and anemia are common conditions in the national population and even combined, they do not amount to "extraordinary and compelling" circumstances warranting release. *See e.g. United States v. McKinney*, 2020 WL 6076898  * W.D. Wa. Oct. 15, 2020 (defendant who suffers from post-traumatic stress syndrome and related sleep disorder which may compromise his immune system failed to meet his burden for compassionate release). The Government notes that a review of the Defendant's medical records show that her more recent hematology results indicate that her platelet count is no longer elevated which negates the need for any cancer screening. (*Id*. at 10). The Court is not convinced that the Defendant's anxiety and anemia are sufficient extraordinary and compelling reasons necessitating her compassionate release.

Moreover, many of the Defendant's general concerns related to the spread of COVID-19 within the BOP facilities is tempered by on-going prevention efforts. For

example, the BOP has modified visitation procedures in response to COVID-19.[2]  More recently, the FCI has fully inoculated 470 inmates and 153 staff.[3] Moreover, at the FCI Phoenix, there are no current staff or inmates noted as testing positive for the COVID-19 virus.[4]  This further confirms that the Defendant has a low probability of contracting the virus.

  b.  Family circumstances

The Defendant next asserts that she should be released because should her mother die, "there is no one capable of caring for her minor children."  She explains that her 67 year-old mother is seriously ill an is "at exceedingly high risk due to her diabetes, hyperlipidemia, hypertension, brain issues, chronic aortic disease, need for heart surgery, morbid obesity, amenia, elevated platelet count and asthma."  (Doc. 208 at 9).  The Government acknowledges that the Defendant's mother suffers "from high-risk co-morbidities" which place her at risk if she contracted COVID-19.  (Doc. 213 at 10).  However, here, too, the Government asserts this argument is merely speculative.  Here, the Court is guided by the BOP's definition of "incapacitation" as one who "suffered a severe injury (e.g. auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child."  *See* Program Statement 5050.50.  In application, the BOP states that documentation must be produced showing the incapacitation of the caregiver.  *Id*.

Here, although the Defendant produced information on her mother's health conditions, it notes that "these conditions, *if uncontrolled*, places [her] at significantly higher risk for serious medical complications and hospitalization" should she contract COVID-19.  (Doc. 208-1 at 47) (emphasis added).  While the Court is sympathetic to the anxiety that these statements must arouse, the Court also notes that this same report states that during the pandemic, no one in the Defendant's family, including her mother and

---

[2] Special Visiting Schedule and Procedures, Bureau of Prisons, https://www.bop.gov/locations/institutions/phx/phx_tvp.pdf (last visited May 21, 2021).
[3] COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last updated May 21, 2021).
[4] *Id.*

- 6 -

children, have contracted COVID-19, and that her mother is receiving routine medical treatment and care. Moreover, it does appear that at least one of the Defendant's children, is approximately twenty-three years-old and her son, is eighteen years-old.[5] The Defendant's Motion does not articulate how her mother is currently incapable of caring for her children, and her argument is primarily based on speculative events. The Defendant's Reply that "COVID *could* take [her] life in short order" misses the point. (Doc. 214 at 3). The Court is not persuaded that a future speculative events are sufficient grounds for compassionate release.[6]  *See United States v. McKinney*, at *5 (observing that the defendant offered no authority providing for compassionate release based on the possible future incapacitation of a caregiver). On this record, the Court does not find that family circumstances currently warrant compassionate release.

    c.  18 U.S.C. § 3553(a) Sentencing Factors

Although the Court has found no extraordinary or compelling reasons to release the Defendant, it will nonetheless weigh the sentencing factors. As an initial matter, the Court finds the crime of conviction extremely malicious. The Defendant was involved in a years-long conspiracy that took advantage of an extremely vulnerable population of people – those who were illegally present in the Unites States. This population, in particular, are vulnerable upon arrival to the United States because they fear being discovered and returned to their home country. Thus, they are susceptible to the types of threats and coercion, which the Defendant engaged in. She participated in a complex scheme which required that she seek out rental properties for the sole purpose of imprisoning her hostages. The Government asserts that the Defendant engaged in threatening behavior and that "she was in the possession of a smuggling ledger and used her own bank account" to receive ransom payments. At time of sentencing, the Defendant was determined to be a manager or supervisor of the conspiracy and she used a firearm in the course of her conduct. (Doc. 213 at 2). The Court also notes that at least 35 victims were held in three drop houses

---

[5] *See* (Doc. 208 at 3; Doc. 208-1 at 54).
[6] The Defendant is not foreclosed from seeking compassionate release should family circumstances change.

during the course of the conspiracy. (Doc. 213-1).  The sentencing court accounted for the maliciousness of the offense in imposing the 198-month custody term.

The Court additionally observes that promoting respect for the law and deterrence are still relevant here.  The Defendant avers that she was "the tender age of 29" when she was convicted and that her conduct was driven by her former husband and co-conspirator. (Doc. 208 at 3).  Yet, he received a sentence of 120 months in custody for the same charged offense. (Doc. 139).  Relevant here is that the Defendant's Reply does not address her conduct during the course of the criminal proceeding. The Defendant had the benefit of being released with conditions pending her trial.  However, shortly after admitting guilt, she fled to Mexico. Consequently, the Defendant did not receive the three-level reduction for acceptance of responsibility as contemplated in her plea agreement and she received a two-point enhancement for obstruction of justice. (*Id*. at 9).  Her conduct also evidenced a blatant disregard for the court that took her guilty plea.  These factors do not weigh in her favor.

As for the rehabilitation factor, at time of sentencing, the Defendant denied alcohol or drug additions and stated she had no need for treatment.   (Doc. 213-1 at 16-17). Nonetheless, she participated in a drug treatment program. Her conduct in custody appears to be unremarkable. To her credit, she has completed her high school equivalency certification for the State of California and a myriad of other BOP programs including food service preparation, gardening, and computer related classes.  The Defendant's conduct in custody tips in her favor.

Upon a consideration of the overall sentencing factors, the Court determines that they do not favor the Defendant.  The Court places significant weight on the sentencing court's imposition of a sentence outside of the contemplated plea agreement.  Moreover, the Court considers that the Defendant's acts effected over 35 individuals who were held hostage for ransom and many of these individuals were threatened with firearms and upon their discovery, at least one individual was transported for medical attention.  (*Id*. at 9). Moreover, the Defendant's conduct while pending sentencing demonstrates a disrespect

for the law, including the judicial system.  At this time, the Court is not persuaded that she meets any of the criteria for compassionate release or release for family circumstances.

Accordingly,

**IT IS HEREBY ORDERED** denying the Defendant's Motion for Compassionate Release (Doc. 208).

Dated this 21st day of May, 2021.

Honorable Diane J. Humetewa
United States District Judge